YALE RICHARDS, TRUSTEE, AN INDIVIDUAL, FOR AND ON BEHALF OF WESTSIDE SUPPLY COMPANY, APPELLEE, V. ROBERT L. ARTHALONEY AND KAREN K. TAYLOR, APPELLANTS.

342 N.W.2d 642

Filed December 23, 1983. No. 82-602.

Monte Taylor and Clayton Byam, for appellants.

Steven J. Riekes of Richards, Riekes, Brown & Zabin, P.C., for appellee.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ.

KRIVOSHA, C.J.

The instant action was commenced in the district court for Douglas County, Nebraska, in which the plaintiff sought to foreclose upon a real estate mortgage dated September 16, 1976, covering three separate tracts of land which had been delivered by the appellants, Robert L. Arthaloney and Karen K. Taylor (formerly Karen K. Arthaloney) (Arthaloneys), then husband and wife, to the appellee, Yale Richards, as trustee for and on behalf of Westside Supply Company, to secure a certain note executed by the Arthaloneys. The note, also dated September 16, 1976, which was executed and delivered by the Arthaloneys to Richards, was in the principal sum of $45,067.82. Robert L. Arthaloney was the sole stockholder of Robert's Sheet Metal Co. (Robert's), a corporation, and the corporation was operated by the Arthaloneys during all the times relevant to this action.

Following the trial, the district court found that the Arthaloneys were indebted to Richards in the sum of $16,582.90, and ordered a foreclosure of the real estate in satisfaction of the debt. The Arthaloneys have now appealed to this court, assigning five specific errors allegedly committed by the trial court. We have reviewed all of the assigned errors and will discuss them hereafter in detail. Our examination of the assignments, however, leads us to the conclusion that the trial court was essentially correct in its decision and, except as modified herein, the judgment should be affirmed.

The evidence discloses that Robert's, a heating and air-conditioning business located in Elkhorn, Nebraska, and a customer of Westside Supply Company, was having financial difficulty in 1976. Ap-

parently, Robert's had experienced such difficulty on previous occasions, but it had succeeded, at least temporarily, in working out those difficulties. In 1976 Robert's was indebted to Westside in the amount of $35,000 for material supplied by Westside to Robert's. Westside determined to terminate Robert's credit with Westside, and so advised Robert's. Because Westside was a principal supplier of Robert's, such action would have been extremely detrimental to Robert's and would have resulted in the company, in all probability, having to discontinue its operations.

In an effort to assist Robert's out of its financial difficulties, Westside agreed to arrange a loan for Robert's with a lending institution known as Financial Management Services, Inc. (FMSI). The evidence discloses that FMSI was an Ohio corporation with its principal place of business in Illinois. As the FMSI membership agreement offered in evidence discloses, FMSI was in the business of providing financing plans for wholesale suppliers who were members of FMSI, as well as for the customers of such members. Westside was a member of FMSI, and therefore Robert's, as a customer of Westside, was eligible for such a loan. In fact, the evidence discloses that in both 1974 and 1975 Robert's had borrowed money from FMSI through this method and was still indebted to FMSI for these loans.

Under the terms of the agreement the customer, Robert's, was required to sign a note with FMSI, and the supplier member, Westside, was required to guarantee the note. Pursuant to this arrangement, the Arthaloneys, on September 16, 1976, signed a promissory note in favor of FMSI in the principal sum of $45,067.82 (Illinois note). While the note itself was not personally signed by the Arthaloneys, they did sign a power of attorney which appointed Joe McLaughlin, "with right of substitution," to physically execute the note within the State of Illinois, where FMSI was located. Apparently, this

was done to have the note signed in the state where FMSI conducted its business, and therefore to subject the transaction to the laws of the State of Illinois. This note, the Illinois note, was an installment note which obligated Robert's to make 36 monthly payments of $1,251 to FMSI.

Westside agreed to guarantee the loan to FMSI, but, as a condition of guaranteeing that loan, it required the Arthaloneys to sign a note in Nebraska in favor of Westside in the amount of the Illinois note. Furthermore, to secure the Nebraska note, Westside required the Arthaloneys to execute and deliver to Westside a mortgage. The mortgage covered the three tracts of land owned by the Arthaloneys. Additionally, the Arthaloneys were required to execute an indemnity agreement whereby the Arthaloneys agreed to indemnify and hold Westside harmless from any payments which Westside would be required to make for and on behalf of Robert's in the event that Robert's defaulted in payment.

The Arthaloneys made monthly payments to FMSI from October 15, 1976, to April 15, 1978, at which time they defaulted in payment, and FMSI required Westside to continue making payments on the note. The evidence discloses that the balance due on April 15, 1978, when Robert's defaulted, was in the amount of $19,141.32. Pursuant to the membership agreement entered into between Westside and FMSI, FMSI took monthly payments from Westside's dealer reserve account in payment of the Illinois note. Westside then, through its trustee, sought to recover from the Arthaloneys on their Nebraska note and mortgage.

In perfecting their appeal to this court the Arthaloneys have assigned five specific errors. We shall discuss each of them in disposing of the appeal.

We believe that the first and most significant issue which must be addressed is assignment No. 3. In that assignment the Arthaloneys maintain that the trial court erred in not finding that Westside was obligated to raise the defense of usury with FMSI on

the Illinois note and that by failing to do so waived its right to reimbursement from the Arthaloneys. In arriving at its decision the trial court found that although the Illinois note to FMSI was usurious, Westside had no obligation to raise the defense absent a request from the Arthaloneys. We need not, however, reach the question of Westside's obligation as guarantor to raise the defense of usury because we believe the trial court was in error in concluding that the Illinois note was usurious.

The Arthaloneys alleged that under the provisions of Ill. Ann. Stat. ch. 74, § 4 (Smith-Hurd 1966), the Illinois note exceeded the lawful rate of interest which could be charged under Illinois law. While on its face that may be true, the same section of the Illinois statute relied upon by the Arthaloneys provides for certain exceptions to the limitation on the amount of interest that may be charged, much like the Nebraska law. Neb. Rev. Stat. § 45-101.04(2) (Reissue 1978). Section 4(c) of the Illinois Interest Act provides as follows: "It is *lawful* to charge, contract for, and receive any rate or amount of interest or other compensation with respect to the following transactions: . . . (c) Any business loan to a business association or copartnership or to a person owning and operating a business as sole proprietor or to any persons owning and operating a business as joint venturers, or to any limited partnership, or to any trustee owning and operating a business or whose beneficiaries own and operate a business, transacted solely for the purpose of carrying on or acquiring the business of such business association, copartnership, joint venture, limited partnership, trustee, beneficiaries, or person . . . ." (Emphasis supplied.) The trial court concluded that the exceptions enumerated did not apply to the facts of this case because the loan to the Arthaloneys was not a loan to any of the specific individuals or entities named in subsection (c). We believe, however, that a reading of the Illinois cases establishes

that if, in fact, the loan is a "business loan," as opposed to a "nonbusiness loan," the exemption applies even though the Arthaloneys individually signed the note through their agent.

The evidence introduced at trial makes it quite clear that although the Arthaloneys individually authorized the execution of the various documents, the loan was clearly a business loan made for and on behalf of Robert's, the corporation. Exhibit 1, for example, the FMSI membership agreement under which the loan was made, specifically provides that the purpose of the plan is to provide financing for members "and the customers of such Members," implying that the loans are limited to business purposes. Section 2 of the same agreement, entitled "Operating Procedures," provides in part, "From time to time, with the voluntary consent of the customer, the Member may select certain accounts owed to the Member by its customer for financing in accordance with the Plan," again implying that these loans are only made for the purpose of paying off customer business accounts. In fact, one of the conditions of the loan agreement is that the member must, simultaneously with the making of the loan, assign to FMSI the customer's unpaid business accounts.

Exhibit 5 was the indemnity agreement executed by the Arthaloneys in favor of Westside. It recited in part, "WHEREAS, Arthaloneys have executed and delivered to Financial Management Services, Inc., an Ohio corporation, a certain promissory note of even date herewith, in the principal sum of Forty-Five Thousand Sixty-Seven and 82/100 Dollars ($45,067.82) *for Robert's Sheet Metal Co.*, and . . . ." (Emphasis supplied.) Again, this establishes the fact that the loan was made on behalf of the business and not the individuals.

Exhibit 7, the minutes of a special meeting of the board of directors of Robert's, provided in part as follows: "Mr. Arthaloney explained to the meeting

that he and Mrs. Arthaloney had been called upon to execute certain documents of indemnification and indebtedness in favor of Financial Management Services, Inc. and Yale Richards, Trustee, for the benefit of Westside Supply Company, which documents he then proceeded to read to the meeting. He informed the meeting that he and Mrs. Arthaloney were willing to execute such documents, provided that the corporation [Robert's Sheet Metal Co.] should indemnify them and he then read an Indemnification and Hold Harmless Agreement which he requested the corporation execute in favor of Robert L. Arthaloney and Karen K. Arthaloney.''

Exhibit 8 was the indemnification agreement signed by Robert's Sheet Metal Co. to Robert L. Arthaloney and Karen K. Arthaloney, and it recited the fact that the Arthaloneys had signed the loan documents, including the FMSI note, *on behalf of* Robert's Sheet Metal Co. The agreement specifically provided, "WHEREAS, said obligation arose out of the business affairs of ROBERT'S SHEET METAL CO. and but for the execution of said documents, the said WESTSIDE SUPPLY COMPANY would have filed suit for the collection of said obligations . . . .''

Finally, exhibit 9, an agreement signed by the Arthaloneys to FMSI, acknowledged that the principal amount of the loan was to pay an account owing from "the Debtor to Westside Supply Co. 'SUPPLIER' in the sum of $35000.00.'' The evidence is clear that the only debtor having an account with Westside Supply Company in the amount of $35,000 was Robert's Sheet Metal Co.

The evidence therefore is overwhelming that, regardless of how the documents may in fact have been executed, the loan was for the purpose of financing an open business account owed by Robert's, a corporation, to Westside Supply, in the amount of $35,000, plus some additional sums owed to FMSI. In fact, the evidence conclusively establishes that

the funds acquired through the FMSI loan were distributed as follows: (1) $9,115.28 to FMSI for a debt already outstanding from previous loans made in 1974 and 1975; (2) $4,483.76 for a past due floor plan account of Robert's; and (3) $26,934.72 to Westside on its current open account. As noted by the Illinois court in *Huss v. Maras*, 77 Ill. App. 3d 554, 556-57, 396 N.E.2d 92, 94 (1979): "Although no authority appears to have defined the word 'loan' in the context of the business loan exception, the term should be broadly read so as to effectuate the policy underlying the exception. It appears that the legislature intended to give vitality to business financing, to make financing more available to smaller business ventures by exempting such transactions, whether evidenced by loans in the conventional sense or by any other financing." And as noted in *Chicago Title & Trust Co. v. Jensen*, 271 Ill. App. 419, 422 (1933): "The question whether a loan is usurious is a question of fact, and in determining that question equity will look to the substance of the transaction and disregard the form, and will not permit parties to evade the statute by any scheme or expedient."

A reading of the various Illinois cases dealing with the question of usury leads one to the conclusion that certain factors are significant in determining whether a loan is in fact a business loan falling within the statutory exception, or otherwise invalid. Those factors are: (1) Is the transaction an attempt on the part of individual signatories of the promissory note to apply the proceeds of the loan to carrying on or acquiring any business of theirs? (2) Is there a representation by a borrower to the lender that the loan is a business loan within the meaning of the Illinois statute, thereby estopping the borrower from claiming that the note was not exempt? (3) Is the use of the loan proceeds to discharge business liabilities rather than personal or nonbusiness ones? (4) What is the purpose of the loan? See, *Metcoff*

*v. Mutual Trust Life Insurance Co.*, 33 Ill. App. 3d 1059, 339 N.E.2d 440 (1975); *Ross v. Lake City Equity Finance Corp.*, 425 F.2d 1 (7th Cir. 1970); *Ehlers v. Frey*, 109 Ill. App. 3d 1004, 441 N.E.2d 651 (1982); *Northwest Fed. Sav. & Loan Ass'n v. Weisberg*, 97 Ill. App. 3d 470, 422 N.E.2d 1101 (1981). We believe that when these factors are examined in light of the evidence, one must conclude this was a business loan within the exemption provisions of the Illinois statute.

In *Rock River Sav. & Loan Ass'n v. Kelly*, 58 Ill. App. 3d 339, 374 N.E.2d 1141 (1978), the Illinois court held that a loan to individual shareholders came within the business exemption of the Illinois Interest Act, thereby precluding the defense of usury. In *Rock River* various individuals, who were stockholders of a corporation owning a motel, sought long-term financing for their motel. In order to obtain the financing they were required to individually sign the note and mortgage. The interest rate exceeded the then lawful rate to individuals. In the action to foreclose the mortgage the individuals defended on the grounds of usury. In rejecting the defense the Illinois court said: "In the instant case, the individual defendants contend that they . . . had no personal business interest in obtaining the loan. . . . It is . . . apparent that the improvement of the property owned by Sterling Motel was undertaken in anticipation of future financial gain by the corporation, and that such financial gain would inure to the benefit of the shareholders of Sterling Motel. It is also noted that the failure to obtain permanent financing for the improvements to the Sterling Motel property would have a detrimental impact upon the financial stability of Sterling Motel, and a consequential adverse impact on the value of the shares of Sterling Motel, which were held by the individual defendants. Therefore, while the proceeds of the loan may have been directed to be paid to the corporation by the individual defendants, as shareholders of such corpo-

ration, the individual defendants, in obtaining the loan, were acting collectively as a business association or joint venture in promotion of the project and their investments in the shares of Sterling Motel." 58 Ill. App. 3d at 342-43, 374 N.E.2d at 1143-44.

Further, in *Maywood-Proviso State Bk. v. Sotos*, 95 Ill. App. 3d 155, 419 N.E.2d 668 (1981), the Illinois court held that the interest charged on a loan was not usurious because the purpose of the loan was to assist a corporation by getting rid of a pressing creditor and thus constituted a "business loan" within the meaning of the Illinois usury exemption statute. In *Sotos* the evidence disclosed that the Sotoses were the sole shareholders and officers of a corporation known as Mr. George's Restaurant, Ltd. The corporation had an outstanding balance on its account with Consumers Packing Company, its supplier of meat. The president of Consumers suggested and encouraged the Sotoses to borrow money to pay off the account. Moreover, he arranged a bank loan for them and actually brought the note to the restaurant for the Sotoses to sign. When suit was later filed on the note, the Sotoses defended on the grounds that the rate charged them as individuals was usurious. Again, in rejecting the contention that the loan was made to the two individuals and not to the business, the court said: "While the defendants contend that the loan was for an existing debt of a corporation for which they had no liability and the proceeds went directly to Consumers and were never in their control, the purpose of the loan was obviously to assist the corporation by getting rid of a pressing creditor. In doing this they were clearly motivated by a desire to help the corporation, not a desire to help Consumers . . . . The fact that the Bank was apparently also motivated by a desire to help Consumers . . . in making the loan, rather than to help Mr. George's Restaurant, makes no difference in this regard—it was still a loan for

business purposes." 95 Ill. App. 3d at 160, 419 N.E.2d at 672.

Likewise, in the instant case the evidence makes it clear that FMSI would not have made a loan to the Arthaloneys unless it was for a business purpose on a business debt owed to one of the members of FMSI. In fact, part of the loan was used to repay what was already a delinquent business debt owed by Robert's to FMSI.

The Arthaloneys rely heavily upon the case of *Metcoff v. Mutual Trust Life Insurance Co.*, 33 Ill. App. 3d 1059, 339 N.E.2d 440 (1975). They, however, misread this decision. In *Metcoff* two sons of Metcoff desired to obtain a loan to develop a real estate investment. Because they were unable to obtain the loan individually, the prospective lender suggested that the sons enlist the financial support of their parents, and a loan was eventually negotiated with the parents while the sons signed as principals. The court adopted the view that the loan was made to the parents, who had no direct business interest in the real estate investment, and that the loan proceeds were then transferred to the sons for the sons' business purposes. The parents in that case were permitted to interpose the defense of usury for the reason that no business purpose of the parents was served by the loan. The court did not permit the sons, however, to interpose the defense.

In the instant case the Arthaloneys cannot maintain that, like the elder Metcoffs, they were innocent bystanders. The Arthaloneys recognized that the FMSI loan was a business loan to Robert's regardless of who signed the note. So direct was the loan to Robert's Sheet Metal Co. that although Robert Arthaloney was the sole stockholder of the corporation, he went through the steps of calling a formal meeting of Robert's and, as president of Robert's, signed an indemnity agreement to him and his wife individually.

The evidence in the record is simply overwhelm-

ing that the loan was a business loan to Robert's for a business indebtedness. The trial court therefore should have determined that the Illinois note was a business loan to Robert's and was not usurious. Having determined that the Illinois note was not usurious and was therefore valid, we now address the other assignments raised by the Arthaloneys.

The Arthaloneys contend that the trial court erred in finding that there was adequate consideration for the various notes. In this regard the Arthaloneys are themselves in error. Their argument is based upon a statement found in 11 Am. Jur. 2d *Bills and Notes* § 227 at 255-56 (1963), which provides: "No considerataion [sic] can be predicated upon a pre-existing obligation which has been fully performed or discharged, or an alleged obligation which is void or nonexistent . . . . These principles are particularly applicable to an instrument given for an obligation of a third person, and it has been held that an instrument is without consideration where given for a debt of a third person *where such debt is worthless and uncollectible*." (Emphasis supplied.) The Arthaloneys maintain that because Robert's Sheet Metal Co. was suffering such severe business losses, the loan by FMSI to it created a debt which was worthless and uncollectible. That, of course, is not what the citation in 11 Am. Jur. 2d, *supra*, means. The evidence discloses that after the loan by FMSI was made Robert's continued operating as a business for a considerable period of time, and in fact made payments on the loan from October 15, 1976, to April 15, 1978. The evidence further discloses that the Arthaloneys took considerable moneys out of the corporation by way of salaries during that same period of time. To suggest that the debt was worthless and uncollectible, within the meaning of the American Jurisprudence citation, and therefore without consideration, is foolish beyond further discussion. The assignment is simply without merit.

A further assignment of error raised by the

Arthaloneys is that the Nebraska note was usurious. This, likewise, is simply without merit. The Nebraska note provided for no interest until default. The amount of the Nebraska note was identical to the principal amount of the Illinois note guaranteed by Westside, and specifically provided that "this note shall bear interest after maturity at the maximum lawful rate." The Arthaloneys argued that because the Illinois note was usurious, therefore the Nebraska note was usurious. But since we have already determined that the Illinois note was not usurious, it therefore follows that the Nebraska note was not usurious. See, also, *Moffitt-Harrison Builders, Inc. v. Sandman*, 177 Neb. 425, 129 N.W.2d 524 (1964); *Western Securities Co. v. Naughton*, 124 Neb. 702, 248 N.W. 56 (1933). The assignment must be overruled.

An additional assignment of error is generally to the effect that Westside was not entitled to reimbursement for the sums allegedly paid out by it to FMSI because there was no competent evidence introduced at trial to establish that such sums had actually been paid by Westside. Again, the record is to the contrary. The Arthaloneys' argument in this regard is based upon their claim that exhibit 20, a computer printout, should not have been admitted into evidence as a business record and that without exhibit 20 the record is devoid of any relevant evidence on this issue. Exhibit 20 consisted of both a computer printout and certain pencil notations apparently put on the document after the business record was prepared. Disregarding the pencil notations, it is clear that exhibit 20, as originally prepared, was a business record which was admissible in evidence in accordance with the Nebraska Evidence Rules. See Neb. Rev. Stat. § 27-803(5) (Reissue 1979). When one considers exhibit 20 without the pencil notations, together with the other evidence offered at trial, the amount due and owing to Westside was clearly established. Exhibit 11 indi-

cates the payments made by Westside to FMSI. This fact was further testified to by David Nowell, general manager of FMSI, who testified that exhibit 11 reflected the payments made by Westside through its dealer account after default by the Arthaloneys. The only objection made to exhibit 11 was that it represented a loan to Robert Arthaloney and not to Robert's, and therefore was irrelevant. This objection was correctly overruled. The evidence in the record clearly establishes what payments were made by Westside to FMSI. There is simply no merit to this assignment of error.

Having determined, however, that Richards did in fact introduce sufficient evidence from which it could be determined how much money was paid by Westside to FMSI on behalf of Robert's, we must re-examine the trial court's determination as to the amount due and owing to Richards by the Arthaloneys under the indemnity agreement. Pursuant to § 3 of the membership agreement, and the testimony with respect to the deductions made from the dealer reserve account, Westside is entitled to be reimbursed for the amount that it paid to FMSI as guarantor of the note. The trial court awarded a total sum of $16,582.90. Of this amount $3,965.32 plus interest was to satisfy Robert's open account to Westside, and $12,617.58 was to satisfy moneys presumably paid by Westside to FMSI. The court calculated the amount of reimbursement on the basis of § 4 of the membership agreement, which indicates that upon default Westside may repurchase the loan, and in doing so the interest was to be calculated at the rate that FMSI paid. Because the amount of the interest was not proved at trial, the court concluded that the amount was not to be included in the judgment. However, a review of the record indicates that pursuant to § 3 of the membership agreement, FMSI was entitled to and did in fact, after default by the Arthaloneys, deduct monthly installment payments from Westside's dealer reserve account in

lieu of payment. The record discloses that before default the Arthaloneys paid a total of $23,798.24, representing both principal and interest. This left an outstanding balance at the time of default in the amount of $19,141.32. Westside is entitled to be reimbursed the amount which was deducted from its dealer reserve account in payment of the note to FMSI. The record discloses that the deductions from the account were made, and therefore the amount to be reimbursed should be modified to reflect the amount deducted and paid to FMSI, which was in the sum of $19,141.32 plus interest in the sum of $2,128.26. Richards is entitled to foreclose the mortgage to satisfy the debt, which we determine to be in the amount of $25,234.90, representing $21,269.58 on the FMSI loan and $3,965.32 on the open account.

Likewise, the last assignment of error is without merit. The Arthaloneys contend that the court erred in finding that the FMSI note was signed by an authorized agent, because the power of attorney appointed Joe McLaughlin and, in fact, the note was signed by Frank T. Capalino, Jr. To begin with, the power of attorney appointed Joe McLaughlin "with right of substitution" by him. The evidence discloses that Mr. Capalino succeeded Mr. McLaughlin in the position of general manager of FMSI, and by his assuming this position he was in fact substituted for McLaughlin. Moreover, the Arthaloneys, with knowledge of who signed the note, did in fact accept the benefits from the loan and the note which had been executed. They also made 19 payments on the note without objection as to the signature. By acknowledging the debt, and making payments with no objection, the Arthaloneys ratified and authorized the signature and cannot now be heard to complain. See Neb. U.C.C. § 3-404 (Reissue 1980). See, also, *Farmers Union Coop Assn. v. Commercial State Bank*, 187 Neb. 376, 191 N.W.2d 168 (1971).

Having concluded, therefore, that all of the

Arthaloneys' assignments of error are without merit, the judgment of the trial court is affirmed as modified herein.

AFFIRMED AS MODIFIED.